UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JUAN A. FERNANDEZ,                                   :
                                                     :
                            Plaintiff,               :
                                                     :        **OPINION AND ORDER**
            -against-                                :        11-CV-3896 (DLI)
                                                     :
MICHAEL J. ASTRUE,                                   :
Commissioner of Social Security,                     :
                                                     :
                            Defendant.               :
-------------------------------------------------------------x
**DORA L. IRIZARRY, United States District Judge:**

Plaintiff Juan A. Fernandez ("Plaintiff") filed an application for Social Security Disability

("SSD") benefits on September 23, 1998, alleging a disability that began on January 19, 1998.

Over the course of fifteen years, Plaintiff's application has been adjudicated and denied by

Administrative Law Judges ("ALJ") four times, remanded by the Appeals Council ("AC") three

times, and remanded once on appeal by a Judge of this Court on stipulation by the Commissioner

of Social Security ("Commissioner").

On August 12, 2011, Plaintiff filed the instant action seeking review and reversal of the

Commissioner's latest decision, pursuant to 42 U.S.C. § 405(g).  (Complaint ("Compl."), Doc.

Entry No. 1.)  Plaintiff moves for judgment on the pleadings and remand solely for a calculation

of benefits, or, in the alternative, remand for a new hearing.  (Pl.'s Mot. for J. on the Pleadings,

Doc. Entry No. 11.)  The Commissioner moves for judgment on the pleadings, pursuant to Fed.

R. Civ. P. 12(c), seeking affirmation of the denial of benefits.  (Def.'s Mot. for J. on the

Pleadings, Doc. Entry No. 13.)  For the reasons set forth below, the Commissioner's motion for

judgment on the pleadings is denied; Plaintiff's motion for judgment on the pleadings is granted,

and the case is remanded solely for the calculation of benefits.

## BACKGROUND

**A.      Procedural History**

Plaintiff's application was denied on initial review on February 5, 1999 and on reconsideration on April 21, 1999.  (R. 86-87, 188-21, 124-26.)[1]  Plaintiff requested a hearing before an ALJ.  (R. 127.)  Plaintiff's first hearing was held on August 24, 2000, before ALJ Sol A. Wieselthier.  (R. 390-460.)  By decision dated February 23, 2001, ALJ Wieselthier found Plaintiff was not disabled.  (R. 88-100.)  Plaintiff filed a request for review and, on May 6, 2003, the AC granted the request, vacated the decision, and remanded his case back to a different ALJ. (R. 152-55.)  The AC directed the subsequent ALJ on remand to: (1) develop the record on Plaintiff's cervical impairment; (2) develop the record on Plaintiff's ability to communicate in English and address same in the credibility determination; (3) properly evaluate Plaintiff's residual functional capacity ("RFC") and the treating, examining, and non-examining source opinions in accordance with disability regulations, and explain the weight given to the opinion evidence; (4) develop the record as necessary from treating sources, a medical expert, and/or a vocational expert; and (5) evaluate Plaintiff's subjective complaints in accordance with disability regulations.  (*Id.*)

Plaintiff's second hearing was held on September 8, 2003, before ALJ Seymour Fier.  (R. 461-524.)  By decision dated February 24, 2004, ALJ Fier found Plaintiff was not disabled.  (R. 101-13.)  Plaintiff requested review and, on August 8, 2005, the AC, for the second time, granted the request, vacated the decision, and remanded the case.  (R. 115-17.)  The remand was based on ALJ Fier's failure to recontact Plaintiff's treating sources for additional evidence or clarification after rejecting a treating physician's opinion that Plaintiff was unable to perform

---

[1] "R." citations are to the correspondingly numbered pages in the certified administrative record.  (*See* Doc. Entry No. 17.)

sedentary work.  (R. 116.)  The AC also directed the ALJ to give further consideration to Plaintiff's RFC and obtain supplemental evidence from a vocational expert.  (R. 117.)

Plaintiff's third hearing was held on February 22, 2006, again, before ALJ Fier.  (R. 525-53.)  By decision dated April 13, 2006, ALJ Fier again found Plaintiff was not disabled.  (R. 15-25.)  Plaintiff requested review.  On February 26, 2007, the AC denied review of ALJ Fier's decision and it became the Commissioner's final decision.  (R. 6-8.)  Plaintiff commenced an action in this district before the Hon. John Gleeson, U.S. District Judge.  *Fernandez v. Astrue*, No. 07-CV-1699 (JG).  Pursuant to a Stipulation and Order of Remand dated October 30, 2007, the Commissioner's decision was reversed and Plaintiff's claim was remanded for further proceedings.  (R. 619-23.)  On December 11, 2007, the AC remanded Plaintiff's case for the third time.  (R. 629-33.)  The remand was based on ALJ Fier's failure to: (1) identify any opinion evidence to support his RFC assessment; (2) weigh the opinions of a State Agency physician, the consultative examiner, and Dr. Lombardi, the medical examiner, which conflicted with the ALJ's RFC assessment; (3) make any findings with respect to Plaintiff's ability to communicate in English, contrary to the AC's previous direction to do so in its May 6, 2003 remand order; and (4) evaluate positive objective signs and testing in the record that could explain Plaintiff's complaints of pain.  (R. 631-32.)  The AC directed the subsequent ALJ to obtain further medical expert evidence to clarify Plaintiff's RFC, develop the issue of Plaintiff's English literacy, and give "articulated weight accorded to the treating physicians" and explain why their opinions were rejected or accepted.  (R. 632-33.)

Plaintiff's fourth hearing was held on October 16, 2008, before ALJ Hazel Strauss ("the ALJ").  (R. 745-830.)  By decision dated August 4, 2009, the ALJ found Plaintiff was not disabled.  (R. 584-603.)  Plaintiff filed a request for review.  (R. 582.)  On June 16, 2011, the AC

denied review and, therefore, the ALJ's decision became the Commissioner's final decision.  (R. 558-60.)  Plaintiff commenced this action on August 12, 2011.  (Compl.)

**B.      Non-Medical and Self-Reported Evidence**

Plaintiff was born in the Dominican Republic on August 15, 1955.  (R. 527-528, 756.)  He has a seventh grade education from the Dominican Republic.  (R. 756-57.)  Plaintiff came to the United States when he was 18 years old and began working as a non-union plumber.  (R. 760-61, 766.)  Plaintiff became a United States citizen in 2002.  (R. 757.)  Plaintiff worked as a union plumber from 1984 until his workplace injury on January 19, 1998, when he fell on the job.  (R. 325, 399, 760.)  Plaintiff alleges he became disabled and unable to work January 19, 1998 as a result of back injuries caused by the workplace accident.  Plaintiff applied for and received a Worker's Compensation award of $400.00 a week through February 2006, at which time Plaintiff accepted a lump sum settlement of $114,000.  (R. 326-97, 528-29, 592.)

**C.      Medical Evidence**

  1.      <u>Medical Evidence Prior to Date Last Insured</u>[2]

On January 19, 1998, Plaintiff tripped and fell at work.  (R. 206.)  That day he was treated at Elmhurst Hospital Emergency Room.  (R. 210-12.)  Plaintiff complained of pain in his lower back and pain and tingling in his left leg.  (R. 211.)  He was able to walk, but pain increased when he did.  (*Id.*)  He was diagnosed with lower back pain and back strain and prescribed Codeine to alleviate the pain.  (R. 212.)

Plaintiff saw Dr. Gerson Mendoza, a chiropractor, on January 21, 1998 and Dr. Mendoza referred Plaintiff to Dr. Noel Fleischer, M.D., a neurologist.  (R. 233, 247-48.)  In a January 28,

---

[2] To qualify for SSD benefits, Plaintiff must be disabled and insured for disability benefits.  42. U.S.C. § 423(a)(1)(A) and (C); 20 C.F.R. §§ 404.101, 404.120, 404.315(a).  Plaintiff last met the insured status requirements of the Social Security Act ("SSA") on December 31, 2003.  Therefore, the period of review is from January 19, 1998, his alleged onset date, to December 31, 2003, his date last insured.

1998 report, Dr. Fleischer stated Plaintiff complained of lower back pain radiation, numbness, and weakness in the left leg, and difficulty sitting, bending, and sleeping. (R. 247.) On examination, he noted lumbosacral spasm and tenderness with impaired range of motion and diminished pinprick in the left thigh. (R. 247-48.) On March 26, 1998, Plaintiff returned for a follow-up and Dr. Fleischer noted Plaintiff had chronic back pain, with pain radiating towards the left leg. (R. 245.) He had difficulty walking and sleeping and was taking Vicodin for the pain, which caused minimal relief. (*Id.*) Plaintiff remained out of work. (*Id.*) On examination, Dr. Fleischer noted the gait was still antalgic, lumbosacral range of motion was diminished, and straight leg raising was positive. (*Id.*) Dr. Fleischer noted Plaintiff suffered from traumatic lumbar radiculopathy and treatment included continuing chiropractic therapy and taking pain medication. (*Id.*) He suggested an MRI scan and noted that a neurosurgical evaluation may be necessary. (*Id.*)

A magnetic resonance imaging ("MRI") scan of Plaintiff's lumbosacral spine was conducted on May 23, 1998. (R. 241.) The scan revealed: (1) small left paracentral herniated nucleus propulsus of L5-S1; (2) concentric bulging annulus fibrosis and small superimposed herniation at L4-5; and (3) moderate thecal sac compression. (*Id.*)

Dr. Mendoza then referred Plaintiff to Dr. Richard J. Radna, M.D., a neurosurgeon. (R. 206-07.) Dr. Radna examined Plaintiff on July 20, 1998 and noted Plaintiff complained of lumbosacral pain and radiation in both legs. (R. 206.) While Plaintiff reported a history of lumbosacral pain prior to the accident, he reported he never missed work because of the pain until the accident and, after the accident, the pain and radiation severely increased. (*Id.*) On examination, Dr. Radna noted moderate bilateral paravertebral spasm and diminished range of motion in the cervical and lumbosacral regions, discomfort at the base of the neck, and

moderately restricted straight leg raising on both sides. (*Id.*) Dr. Radna opined that Plaintiff's MRI revealed severe disc desiccation of the L4-L5 level in association with a severe disc herniation and spinal stenosis. (*Id.*) His diagnostic impression was causally-related cervical and lumbosacral, musculo-skeletal, and radicular pain syndromes. (R. 207.) He opined that the causally-related disability was total and recommended spine surgery. (*Id.*)

Dr. Mendoza then referred Plaintiff to Dr. Rick Jasjit Singh, D.O., a neurologist and neurophysiologist. Dr. Singh examined Plaintiff on February 16, 1999. (R. 242-43.) Plaintiff complained of burning back pain radiating down to the left leg and noted that pain medication, Motrin, helped "somewhat" relieve the pain. (R. 242.) On examination, Dr. Singh noted decreased sensation to light touch and pinprick over left L5 and "possibly S1," normal gait, limited range of motion in paraspinal musculature, and lumbosacral spasm and tenderness. (R. 243.) Dr. Singh's assessment of Plaintiff was lumbosacral radiculopathy on the left side. He recommended electromyography ("EMG") and nerve conduction velocity ("NCV") studies, and that Plaintiff should continue with Motrin and chiropractic care. (*Id.*)

An EMG performed on February 23, 1999, revealed denervation of the right L5 and SI paraspinal musculature. (R. 259.) Dr. Singh concluded that the EMG was consistent with a lumbosacral radiculopathy, most prominent on the right side at L5-S1. (*Id.*) A second EMG performed on May 12, 1999, revealed mild denervation of the C4 paraspinal muscular, which was most consistent with a possible C4 lesion on the right side. (R. 278.)

A cervical MRI performed on August 14, 1999 revealed: (1) multilevel cervical spondylosis; (2) rod-like straightening cervical lordosis consistent with muscular spasm, rotatory scoliosis towards right; (3) herniation discs C2-C4 toward the right, centrally; (4) bulging disc C4-C5; (5) central herniation disc C5-C6 indenting spinal cord; (6) herniation disc C6-C7

towards the left, centrally indenting spinal cord; (7) bulging disc C7-T1; (8) uncovertebral joints prominent in size levels C2-C7, articulating facets all levels C2-T1; and (9) stenosis central canal, stenosis neural foramina all levels C2-T1.  (R. 258.)  On August 18, 1999, Dr. Singh noted Plaintiff complained of pain radiating to his left shoulder, as well as depression and memory loss.  (R. 267.)  After reading the cervical MRI, the doctor diagnosed Plaintiff with cervical radiculopathy, lumbosacral radiculopathy, and pseudodementia.  (*Id.*)  Plaintiff was to continue chiropractic treatment and taking pain medication. (*Id.*)

On March 14, 2000, Dr. Singh gave Plaintiff three trigger point injections in the right side of his lumbosacral paraspinal musculature.  (R. 268.)  In a May 9, 2000 report, Dr. Singh noted Plaintiff continued to be in "severe pain" and had not returned to work, and that his gait was antalgic.  (R. 274-76.)  On examination, he noted paraspinal muscle tenderness, muscle spams, and limited range of motion in the cervical and lumbosacral spine, and decreased sensation to light touch and pinprick in C5 and L5 on the left side.  (R. 275-76.)  His diagnosis remained the same.  (R. 276.)  He opined Plaintiff was "totally disabled at this point" and started Plaintiff on Naprosyn to control the pain.  (*Id.*)

a. *Lumbar Spinal Impairment, Multiple Impairments, and Physical Residual Functional Capacity Questionnaires By Treating Physicians*

Dr. Mendoza completed a Lumbar Spinal Impairment Questionnaire on May 18, 2000. (R. 233-38.)  Plaintiff had seen Dr. Mendoza twice a month since the accident in 1998.  (R. 233.) Dr. Mendoza noted Plaintiff's primary symptoms included constant low back pain and stiffness, radiating pain and burning in lower limbs, loss of feeling and weakness in lower limbs, and difficulty sitting, walking, standing, and climbing stairs.  (R. 233.)  He noted that for a "normal competitive five day a week work situation," Plaintiff could sit, stand, and walk for one hour

each, and could not sit continuously in a work setting.  (R. 235.)  Plaintiff would need to alternate position between sitting, standing, and lying each half-hour.  (*Id.*)

Dr. Singh completed a Lumbar Spinal Impairment Questionnaire on August 29, 2000. (R. 250-56.)  Dr. Singh diagnosed Plaintiff with cervical and lumbosacral disc herniation and radiculopathy and gave him a "poor" prognosis.  (R. 250.)  Dr. Singh noted Plaintiff's pain was "moderate severe constant and accompanied by sharp shooting."  (R. 252.)  The pain was located down the back and in both lower limbs.  (*Id.*)  Standing, walking, lifting, and bending precipitated the pain and Plaintiff was unable to relieve the pain with medication.  (*Id.*)  Dr. Singh opined that in a "normal competitive five day a week work situation," Plaintiff could sit, stand, and walk for one hour and would not be able to sit, stand, or walk continually.  (R. 252-53.)  Plaintiff could not lift or carry any weight.  (R. 253.)  Dr. Singh opined Plaintiff would need to take two to four unscheduled breaks of five to ten minutes each during an eight-hour workday and his condition interfered with his ability to keep his neck in a constant position.  (R. 255.)  Plaintiff had limitations for pushing, pulling, kneeling, bending, and stooping.  (*Id.*)  Dr. Singh opined Plaintiff was "fully disabled – permanent."  (R. 255.)

Dr. Singh also completed a Physical Residual Functional Capacity Questionnaire on August 29, 2000.  (R. 261-66.)  Dr. Singh opined that in a competitive eight-hour workday Plaintiff could, in total, sit and stand for less than two hours each, and continuously sit and stand for thirty minutes each.  (R. 263.)  Plaintiff needed to walk every forty-five minutes for approximately nine minutes.  (R. 264.)  Dr. Singh opined that in a competitive work situation, Plaintiff could not lift or carry at all.  (R. *Id.* (in this section Dr. Singh underlined "competitive" on the questionnaire).)  Plaintiff would have significant limitations in repetitive reaching,

handling, or fingering in a work environment, and could not reach with his arms or bend or twist at the waist. (R. 265.)

Plaintiff began treatment with Dr. Nidia R. Carrero, M.D., anesthesiologist, of Universal Medical Practice, on August 1, 2002. (R. 284.) Dr. Carrero completed a Multiple Impairments Questionnaire on February 10, 2003. (R. 284-91.) Dr. Carrero's diagnosis mirrored that of Dr. Singh and she gave Plaintiff a "fair" prognosis. (R. 284.) Dr. Carrero identified Plaintiff's symptoms as neck stiffness, lower back pain radiating to his legs, and pain in the neck, right shoulder, and right leg. (R. 285.) The pain was daily, precipitated by prolonged sitting and standing, and interfered with Plaintiff's ability to sleep. (R. 285-86.) Dr. Carrero opined that, in a competitive eight-hour workday, Plaintiff could sit and stand for one to two hours, could not sit continuously, and must get up and move around every forty to sixty minutes for approximately forty-five minutes. (R. 286-87.) Plaintiff could occasionally lift or carry up to five pounds, but could never lift or carry over five pounds. (R. 287.) Plaintiff's symptoms would increase if placed in a competitive work environment. (R. 288.) Plaintiff had limitations for pushing, pulling, kneeling, bending, and stooping. (R. 290.)

      2.    <u>Medical Evidence After Date Last Insured</u>

Plaintiff was referred to Dr. Apostolos P. Tambakis, M.D., orthopedic surgeon, who examined him on October 20, 2004. (R. 293-94.) Plaintiff complained of headaches, pain and stiffness in the neck radiating to the dorsal spine, shoulders, and sometimes arms. (R. 293.) He had constant back pain radiating to both sacroiliac joints and both legs, and problems lifting and holding on to things. (*Id.*) Coughing, lifting, and prolonged standing and walking precipitated the pain. (*Id.*)

On examination, Dr. Tambakis noted Plaintiff had limited range of motion in the neck, particularly in the right side, and was unable to touch the tip of chin to the shoulder or the ear to the shoulder. Backwards extension of the neck was painful. In overhead positions, Plaintiff had stiffness in both shoulders. (*Id.*) Elbows, wrists, and fingers were normal and his fist was complete, though grip was weak. (*Id.*) Plaintiff did not walk with a limp and could walk on his toes, but had difficulty walking on heels or squatting. Plaintiff had difficulty getting up from a sitting position and had pain in his back when he moved. (*Id.*) Dr. Tambakis noted Plaintiff had "tremendous difficulty" rolling from supine-prone position, and had tenderness and muscle spasms in the lumbar spine. (R. 294.) Straight leg raising was painful at 50 degrees. (*Id.*) Dr. Tambakis reviewed Plaintiff's 1998 MRI. His diagnosis was sprain cervical spine with signs of cervical radiculitis, more to the right than to the left, and sprain lumbosacral spin with signs of sciatic radiculitis. (*Id.*) He opined that Plaintiff had a "moderate-marked disability" related to his accident and had restrictions in prolonged walking and standing, and climbing stairs. (*Id.*) Plaintiff had difficulty using fingers for fine manipulations and was unable to do continuous bending, lifting, or carrying objects over five to seven pounds. (*Id.*)

Dr. Carrero examined Plaintiff on December 9, 2005, noting he had been a patient of the clinic for several years. (R. 304-05.) Plaintiff's impairment had been treated with trigger point injections, some physical therapy, ongoing chiropractic care, and he continued to take over-the-counter pain medication and, when he could afford it, nonsteroidal muscle relaxants. (R. 304.) Plaintiff had returned to see her, because his lower back pain radiating to the left leg was becoming "more and more unresponsive to usual modes of therapy." (*Id.*) Though he had been receiving chiropractic care once a month, Plaintiff felt it was insufficient to address the level of pain he had experienced in the past several months. (*Id.*) She observed "it is evident that the

patient is quite uncomfortable." (*Id.*)  She noted new evidence of muscle spasms and trigger points over the paraspinal muscles between the L2 that radiated down to the gluteus maximus muscles, especially on the left side.  (*Id.*)  Dr. Carrero recommended a more recent MRI to determine whether the cause of pain was still the herniated left L5-S1 disc and whether treatment would include epidural steroid injections or surgery.  (R. 304-05.)  She suggested that physical therapy and chiropractic treatments be increased to more than once a month.  (*Id.*)  She noted that Plaintiff had gone through a variety of nonsteroidal and other medication for pain, which "to date has only provided him with GI [gastrointestinal] upset and no true clinical medical benefit." (*Id.*)  She recommended Plaintiff see a neurosurgeon for a second opinion.  (R. 305.)  She noted Plaintiff's prognosis was "guarded."  (*Id.*)

Plaintiff had an MRI of the lumbar spine on February 9, 2006.  (R. 306-07.)  The MRI revealed: (1) "Mild to moderate degenerative changes in the lumbar spine, most severe at the L5-S1 level.  Specifically, there is a 4 mm left paracentral disc extrusion, which extends into the left lateral recess and *may* impinge the transiting left S1 nerve root at this level;" and (2) "Straightening of the normal lumbar lordosis."  (*Id.* (emphasis in original).)

On April 7, 2006, Plaintiff underwent the following spine surgery to alleviate pain: L5-S1 laminotomy, medial facetectomy, microdiskectomy.  (R. 386-89.)  A computed tomography ("CT") scan of the lumbosacral spine, performed in preparation of surgery, revealed a "very large L5-S1 disk protruding into the neural foramen on the left side and pressing the S1 nerve root."  (R. 386-87.)  This finding was confirmed by the surgeon during the procedure:  "A very large defect was seen in the annulus fibrosis at the approximate site where the bulging disk was seen."  (R. 388.)

In addition, on April 30, 2008, Dr. A. Josephena Escudar, a physician in the Dominican Republic, began treating Plaintiff.  (R. 678.)  On June 16, 2008 she completed a Lumbar Spine Impairment Questionnaire in Spanish. .  (R. 678-81.)

a.      *Spinal Impairment Questionnaire by Dr. Tambakis*

Dr. Tambakis completed a Spinal Impairment Questionnaire on October 20, 2004.  (R. 295-301.)  He noted Plaintiff's prognosis was "guarded."  (R. 295.)  He noted cervical and lumbar limited range of motion, tenderness, and muscle spasms, as well as lumbar reflex changes and muscle weakness.  (R. 295-96.)  Plaintiff's neck pain radiated to the right shoulder and his back pain radiated to his right leg.  (R. 298.)  The pain was constant and occurred daily.  (R. 298.)  Dr. Tambakis opined that, in a competitive eight-hour workday, Plaintiff could sit three to four hours and stand or walk zero to one hour, and Plaintiff could not sit continuously.  (R. 297.)  He opined Plaintiff could lift and carry up to five pounds frequently, five to ten pounds occasionally, and never over ten pounds.  (R. 297, 299.)  Dr. Tambakis noted Plaintiff needed epidural injections.  (R. 299.)  Dr. Tambakis opined that Plaintiff had limitations for pushing, pulling, kneeling, bending, and stooping.  (R. 299-300.)

3.      Consultative Examinations

The Division of Disability Determination referred Plaintiff for a consultative examination.  Accordingly, on January 7, 1999, Dr. Roger Antoine, M.D., examined Plaintiff.  (R. 220-21.)  Dr. Antoine noted Plaintiff could sit for a couple of hours and stand up to one to two and a half hours; except he could not stand for more than one hour when it was cold.  (R. 220.)  He could walk up to ten blocks without stopping, had difficulty navigating stairs, and could lift up to five pounds.  (*Id.*)  Plaintiff's daily activities included watching television and resting.  His daughter shopped for him and his wife did the household chores.  On examination,

Dr. Antoine noted Plaintiff was wearing a lumbosacral brace.  He could barely stand up and walk on his toes.  He noted a bilateral lumbar spasm.  Plaintiff could get onto the examine table independently, but needed help to go from supine to sitting up position.  (*Id.*)  Dr. Antoine noted Plaintiff had a full range of motion of the cervical spine, shoulders, elbows, and wrists.  (*Id.*)  Plaintiff could do straight leg raising up to 45 degrees on the left and 60 degrees on the right.  (R. 221.)  Dr. Antoine diagnoses were: "s/p severe sprain of the lumbosacral spine;" "a history of lumbar disc herniation on MRI;" and "bilateral lumbar radiculopathy."  He opined that Plaintiff had difficulty performing daily activities requiring prolonged sitting and standing, walking long distances, heavy lifting, and navigating stairs.  (*Id.*)  Dr. Antoine's prognosis was "guarded." (*Id.*)

On January 22, 1999, a New York State agency medical consultant reviewed Plaintiff's file and completed an RFC.  (R. 222-29.)  The RFC provided that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently.  (R. 223.)  He could stand or walk six hours and sit six hours of an eight-hour workday with normal breaks.  Pushing and pulling was unlimited.  Plaintiff could perform postural activities as to climbing, balancing, stooping, kneeling, and crouching "occasionally."  (R. 224.)  There were no manipulative, visual, communicative, or environmental limitations.  The medical consultant noted that Dr. Mendoza's finding that Plaintiff could perform only less than sedentary work activities was not supported by objective findings, but the "orthopedic evaluators' findings are more consistent [with the] proposed RFC."  (R. 228.)  On April 21, 1999, Dr. Anthony Buonocore, M.D., a New York State agency medical consultant reviewed the evidence and agreed with the January 22, 1999 assessment.  (R. 229.)

**D.      Hearing Testimony**

On October 16, 2008, Plaintiff appeared with counsel and testified before the ALJ.  (R. 745-830.)  Plaintiff did not use a Spanish language interpreter, though one was present.  (R. 747.)  In addition, Dr. J. Warren Axline, M.D., testified as a medical expert ("ME") and Pat Green testified as a vocational expert ("VE") by telephone.  (R. 769-819, 833-29.)

1.      Plaintiff's Testimony

Plaintiff testified that he had come to the United States from the Dominican Republic when he was 18 years old, had a seventh grade education obtained in the Dominican Republic, and learned English while working as a plumber.  (R. 756-57, 764.)  He began working as a non-union plumber at 18 or 19 years old, learned plumbing work on the job, and became a union plumber in 1984.  (R. 760-61.)

The ALJ questioned Plaintiff on his English language ability.  Plaintiff testified he spoke and understood English, but could not read or write in English.  (R. 757.)  He learned English speaking with his friend on the job as a plumber, but his friend never taught him how to read.  (R. 754, 764.)  When he became a United States citizen in 2002, he "learned what [he] was suppose [sic] to learn" to pass the citizenship test and the words he had to read in English were "simple."  (R. 757-58.)  Plaintiff had problems writing in English and did not know the alphabet.  (R. 757, 764 ("Q: So, having difficulty [writing in English], doesn't mean that you cannot write in English."  A: "I cannot write English. I cannot write English.").)  He had a driver's license, but did not remember whether the driver's test was in English.  (R. 758-59.)  Plaintiff did sign papers to join the union, but at that time the process was "simple."  (R. 761.)  Plaintiff testified he did not help his children with their schoolwork.  (R. 763.)

14

The ALJ stated she did not need any further testimony of Plaintiff, because there were transcripts in the record from the previous hearings.  (R. 768.)  On August 24, 2000, Plaintiff testified at his first hearing.  (R. 290.)  Plaintiff testified that he lived with his wife and four children, then, aged 13, 22, 23, and 24.  (R. 294.)  Plaintiff had a driver's license and occasionally drove short distances, but did not use public transportation.  (R. 395-96.)  Plaintiff testified that, since his work accident, his back was in permanent pain.  (399-400.)  Plaintiff took pain medication daily that provided only temporary relief and affected his stomach and gallbladder.  (R. 400, 402-03.)  He also testified to pain in his shoulders and his hand.  (R. 417.)  He had seen Dr. Singh twice every two months for the past two years, Dr. Mendoza twice a month, and was no longer seeing Dr. Fleischer.  (R. 400-01.)  He spent the day watching television while lying on the couch, sitting outside in the yard, and visiting family and friends a few times a week.  (R. 407-08.)  He walked two blocks to visit family, but drove the five blocks to visit his brother, as that was too far for him to walk.  (R. 415.)  Plaintiff could walk one block, before needing to sit for five to ten minutes and could stand for five minutes before sitting down.  (R.404-05.)  He had problems grasping with his hands.  (R. 406.)  He did not sleep well at night because of the pain.  (R. 411.)  He attended church each Sunday, walked two blocks to get there, and alternated between sitting and standing during the service; he also knelt in church for fifteen minutes at a time.  (R. 406, 413.)  He dressed himself, but his wife did the house chores and his wife and son did the shopping.  (R. 414-15.)

At his second hearing on September 8, 2003, Plaintiff testified he saw Dr. Mendoza once a month and Dr. Carrero every two months.  (R. 471.)  He wore a back brace, but not a neck brace and, while he sometimes used a cane, he did not use one the day of the hearing.  (R. 472.)  He spent his days watching television and playing with his three grandchildren, but did not take

care of the children.  (R. 473.)  He drove about fifteen blocks to visit his brother, a couple times a week.  (R. 473-74.)  Two weeks before the hearing, he spent three weeks in the Dominican Republic to visit his sick mother.  (R. 475.)  He testified that the back pain was constant and that it went down both legs, while in 1999 it only went down one leg.  (R. 476.)  He had neck pain, which began around the year 2000, that spread to his shoulders.  (R. 477.)  He could sit for half an hour before needing to get up to stretch his back and could stand for about forty minutes, before it caused pain.  (R. 478-79.)  He could lift no more than five to ten pounds.  (R. 479.)  He testified he could not read or write.  (R. 481-82.)  When asked how he passed the test to be a United States citizen if he could not read or write, he responded that he "could do it, but I don't do it well."  (R. 481.)  Plaintiff testified he could not go back to work because of the pain in his back and neck.  (R. 483.)

At his third hearing, on February 22, 2006, Plaintiff testified that he continued to see Dr. Mendoza once a month and saw Dr. Carrero every three or four months.  (R. 530.)  He had traveled to the Dominican Republic the week before the hearing for nine days.  (R. 533.)  When asked about the MRI he was scheduled for on February 6, 2006, he testified he could not stand the pain, but needed an MRI before he could have surgery.  (R. 533.)  Plaintiff stated he could sit for five to ten minutes before he had to stand, and could stand for about ten to fifteen minutes before changing positions.  (R. 534.)  He could walk about half a block before needing to stop and was using a cane on the day of the hearing.  (R. 534.)  Plaintiff testified the pain in his back was a ten out of ten and the pain in his neck was a four out of ten.  (R. 534.)

2.    Medical Expert's Testimony

The ME reviewed Plaintiff's record and testified by telephone as to Plaintiff's medical status during the period at issue, January 19, 1998 through December 31, 2003.  (R. 769-819.)

The ME testified that Plaintiff was diagnosed with cervical and lumbar spine impairment.  (R. 778, 789.)  Plaintiff did not have myelopathy (pathology of the spinal cord) or nerve findings related to the herniated disk at L5-S1.  (R. 780, 782.)  The ME found Plaintiff had "definite lumbar disc degeneration," "minor findings electrically and on physical examinations, subjective findings," but "no objective findings that would meet listing 1.04(A)."  (R. 785-86, 789.)

The ALJ questioned the ME about Plaintiff's shoulder impairments, as directed by the Appeals Council on remand.  (R. 789-90.)  The ME testified Plaintiff had no shoulder impairment, because there were no symptoms or findings of pathology in the shoulder.  (R. 790.)  The ME testified several RFC's were "totally without support" as to Plaintiff's shoulder impairment, because, if Plaintiff could not lift any pounds, he could not drive, open a car door, lift a cup of coffee, or dress himself.  (R. 789-90, 800.)

The ME testified that for the relevant period, Plaintiff's functional limitations would be: (1) no restrictions for sitting as long as he could take normal breaks; (2) standing restricted to one hour at a time and two hours total for the day; (3) walking limited to one hour at a time and two hours a day; (4) lifting and carrying restricted to twenty pounds occasionally and ten pounds frequently, although he should not be in work that required lifting ten pound objects from the floor, full time and all day; (5) postural limitation restricted as to crawling and bending, and climbing limited occasionally; and (6) no restrictions as to manipulative, fingering, or hand movements or environmental limitations.  (R. 790-92, 794, 797.)

The ME testified that Dr. Singh's questionnaires lacked validity, because Dr. Singh: opined that Plaintiff could not lift any pounds, which was not consistent with Plaintiff's daily activities; had different opinions on two questionnaires completed the same day; and gave no basis for his finding that Plaintiff had trouble with repetitive reaching and reaching overhead.

(R. 799-800.)  The ME similarly found fault with Dr. Carerro's RFC, because neither a lumbar nor a cervical sprain would limit a patient to lifting and carrying five pounds occasionally.  (R. 801.)  Furthermore, there was nothing in the record to support limitations in fine manipulations. (*Id.*)

The ME also testified that Dr. Tambakis' findings that Plaintiff's straight leg raising test was not positive for both supine and sitting was an indication Plaintiff was malingering and exaggerating symptoms.  (R. 802.)  Similarly, the ME noted Dr. Singh diagnosed Plaintiff with pseudodementia, which indicated symptom exaggeration.  (R. 798.)

     3.   <u>Vocational Expert's Testimony</u>

The VE testified that Plaintiff's past work classification was a plumber, which was skilled work rated at a medium level of physical exertion.  (R. 824-25.)  The ALJ established Plaintiff could not do his past work.  (R. 826.)

The ALJ presented the VE with a hypothetical of a 47-year-old person with a seventh grade education obtained in the Dominican Republic, who can communicate in English, read very little English, and cannot write in English.  (R. 825.)  The ALJ set forth the following limitations for work at a light level of physical exertion: lift and carry twenty pounds occasionally and ten pounds frequently; no limitations for sitting, thus he can sit six hours in an eight-hour day with usual breaks; stand in one spot one hour at a time and two hours total in an eight-hour day; walk one hour at a time and two hours total in an eight-hour day; occasionally climb stairs, bend, and squat; and no limitations for pushing, pulling, or manipulations.  (R. 825-27.)

The VE responded with the following unskilled work at the light level, which existed in significant numbers in the national economy: assembler of small products (DOT Code

739687030); garment sorter (DOT Code 222687014); and inspector and hand packager (DOT Code 559687074).   (R. 828.)   Plaintiff's attorney asked the VE whether, if the hypothetical person could sit for less than six hours in an eight-hour day, stand and walk less than two hours in an eight-hour day, and lift and carry less than ten pounds, would that person have a less than sedentary RFC?   (*Id.*)   The VE responded in the affirmative and that it would preclude him from performing any jobs, including those she had mentioned before.   (R. 828-29.)

**DISCUSSION**

**A.   Standard of Review**

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."   42 U.S.C. § 405(g).   A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.   *See Schaal v. Apfel*, 134 F. 3d 496, 504 (2d Cir. 1998).   The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act."   *Echevarria v. Sec'y of Health & Human Servs.*, 685 F. 2d 751, 755 (2d Cir. 1982) (internal citations omitted).   The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social

Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F. 3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F. 3d 770, 774 (2d Cir. 1999).

**B.      Disability Claims**

To receive disability benefits, claimants must be disabled within the meaning of the Act. *See* 42 U.S.C. §§ 423(a), (d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F. 2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. §§ 404.1520 and 416.920. If at any step the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there. First, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20

C.F.R. §§ 404.1520(b), 416.920(b).   Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education or work experience.   Impairments are "severe" when they significantly limit a claimant's physical or mental ability to conduct basic work activities.   20 C.F.R. §§ 404.1520(c), 416.920(c).   Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.   *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's RFC in steps four and five.   20 C.F.R. §§ 404.1520(e), 416.920(e).   In the fourth step, the claimant is not disabled if he or she is able to perform past relevant work.   20 C.F.R. §§ 404.1520(f), 416.920(f).   Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education and work experience.   If so, the claimant is not disabled.   20 C.F.R. §§ 404.1520(g), 416.920(g).   At this fifth step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work.   *See Draegert v. Barnhart*, 311 F. 3d 468, 472 (2d Cir. 2002) (citing *Carroll,* 705 F. 2d at 642).

## C.     The ALJ's Decision

On August 4, 2009, the ALJ issued her decision denying Plaintiff's claims.   (R. 587-603.) The ALJ acknowledged that the Appeals Council remand order stated the prior ALJ had failed to: (1) specify the weight given to the opinion of Dr. Antoine that Plaintiff would have difficulty with prolonged sitting, standing, and walking, heavy lifting, and negotiating stairs; (2) acknowledge the testimony of Dr. Lombardi, a medical expert, that Plaintiff's exertional limitations were more consistent with sedentary work, when the ALJ found a light work RFC; (3) address whether Plaintiff could communicate in English; and (4) reference many positive

objective signs and testimony in the record explaining Plaintiff's complaints of pain.  (R. 587-88.)

The ALJ followed the five-step procedure in making the determination that, for the alleged disability period, Plaintiff could perform jobs available in significant numbers in the national economy.  (R. 603.)  At the first step, the ALJ determined that Plaintiff had not worked from his alleged onset date, January 19, 1998, through his date last insured, December 31, 2003.  (R. 590.)  At the second step, the ALJ found Plaintiff suffered from the following severe impairments: lumbar spine disc disease and cervical spine disc disease.  (*Id.*)  At the third step, the ALJ concluded Plaintiff's impairments, in combination or individually, did not meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)

At the fourth step, the ALJ found that Plaintiff had a RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except for the following limitations: stand in one spot for an hour at a time and a total of two hours in an eight-hour day; walk one hour at a time for a total of two hours in an eight-hour day; climb stairs, bend, and squat occasionally; and lift and carry twenty pounds occasionally and ten pounds frequently.  (R. 590, 602.)  The ALJ found Plaintiff was not limited in the ability to sit, could sit for six hours out of an eight-hour day with usual breaks, and was not limited in pushing, pulling, or manipulation.  (R. 590.)  Additionally, the ALJ took note that Plaintiff was 48-years-old on the date last insured, which is defined as a "younger individual," Plaintiff could speak and understand English, and read and write in English sufficiently to be considered literate.  (R. 591, 601 (citing 20 C.F.R. §§ 404.1563 and 404.1564).)  The ALJ found Plaintiff was unable to perform his past relevant work as a plumber, which required a medium level of physical exertion.  (R. 601.)

As to Plaintiff's credibility, the ALJ found Plaintiff's impairments could reasonably be

expected to cause the alleged symptoms, but the extent and limiting effects of the symptoms were not credible because they were inconsistent with the RFC. (R. 592, 601.) The ALJ gave the opinions of Plaintiff's treating physicians "little weight," and "less than significant weight." (R. 595-96.) The ALJ gave "great weight" to the findings and opinion of Dr. Axline, the non-examining medical expert who testified at the 2008 hearing, and "adopted" his findings and opinion "as [her] own." (R. 597.) She also gave the opinion of Dr. Buonocore, a non-examining medical consultant, significant weight. (R. 599.)

At step five, the ALJ found, based on the testimony of the vocational expert, that Plaintiff could perform jobs that existed in significant numbers in the national economy: assembler of small products (DOT Code 739687030), 5,000 jobs locally and 312,884 nationally; garment sorter (DOT Code 222687014), 3,000 jobs locally and 197,723 nationally; and inspector and hand packager (DOT Code 559687074), 5,000 jobs locally and 469,000 nationally. (R. 602-03.)

## APPLICATION

Plaintiff moves for judgment on the pleadings, contending that the ALJ failed to properly evaluate the medical evidence, Plaintiff's RFC, and Plaintiff's credibility, and that Medical Vocational Rule 201.17 requires a finding of "disabled." (Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl. Mem.") at 1, Doc. Entry No. 12.) The Commissioner cross-moves for judgment on the pleadings, contending substantial evidence supports the Commissioner's decision that Plaintiff was not disabled during the relevant period and the ALJ applied the correct legal standards. (Mem. of Law in Supp. of Def.'s Cross Mot. for J. on the Pleadings ("Def. Mem.") at 1, Doc. Entry No. 14.) The Commissioner's motion is denied and Plaintiff's motion is granted for the reasons stated below.

A.      **Treating Physician Rule**

A treating source's medical opinion on the nature and severity of the impairment is given controlling weight when it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Schisler v. Sullivan*, 3 F. 3d 564, 567 (2d Cir. 1993) (citing 20 C.F.R. 404.1527(d)). With respect to "the nature and severity of [a claimant's] impairment(s)," 20 C.F.R. § 404.1627(d)(2), "[t]he SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F. 3d 99, 106 (2d Cir. 2003). The Second Circuit has noted that "[w]hile the opinions of a treating physician deserve special respect . . . they need not be given controlling weight where they are contradicted by other substantial evidence in the record." *Lazore v. Astrue*, 443 F. App'x 650, 652 (2d Cir. 2011) (quoting *Veino v. Barnhart*, 312 F. 3d 578, 588 (2d Cir. 2002)). Where a treating source's opinion is not given controlling weight, the proper weight accorded by the ALJ depends upon several factors, including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark v. Comm'r of Social Security*, 143 F. 3d 115, 118 (2d Cir. 1998); *see also* 20 C.F.R. § 404.127(c)(2).

1.      Weight Given to the Findings and Opinions of Non-Examining Sources

At the outset, the ALJ committed error in giving Dr. Axline's findings and opinion "great weight" and adopting them "as [her] own." (R. 597.) Dr. Axline never examined or treated Plaintiff and relied solely on the medical records in the administrative record to form his opinions. *See Pratts v. Chater*, 94 F. 3d 34, 38 (2d Cir. 1996) (a doctor's assessment of another

doctor's findings merits little weight in a disability determination) (citing *Vargas v. Sullivan*, 898 F. 2d 293, 295-96 (2d Cir. 1990)); *Vargas*, 898 F. 2d at 296 (in elevating the opinion of the medical adviser, who had never examined plaintiff, over that of the treating physician, the ALJ "violated a general rule adopted in all, or virtually all, of the circuits"); *see also Roman v. Astrue*, 2012 WL 4566128, at *16 (E.D.N.Y. Sept. 28, 2012).  The ALJ also erred in giving significant weight to Dr. Buonocore, a non-examining medical consultant, for the same reasons.  (R. 599.)

Moreover, Dr. Axline's testimony contained several errors, which should have raised questions about his grasp of the record and his credibility.  For example, Dr. Axline testified that Dr. Singh's questionnaire mentioned Plaintiff's pain medications caused side effects, when no such side effects were present in the record.  (R. 595.)  While the ALJ relied on this statement in giving Dr. Singh's RFC assessment little weight, Dr. Axline is incorrect.  (*Id.*)  Dr. Carrero noted Plaintiff had tried various pain medications, but they had caused GI upset, and Plaintiff testified in 2000 that the pain medications affected his stomach and gallbladder.  (R. 304, 403.)  Dr. Axline also erroneously testified that there was no evidence in the record to show Plaintiff had "actual limitations" in walking, because he was able to heel walk and toe walk and had normal gait.  (R. 791.)  This statement is controverted by examinations in the record.  (*See* R. 245 (in 1999 Dr. Fleischer observed an antalgic gait); 279 (in 2000 Dr. Singh observed an antalgic gait); 220 (in 1999 Dr. Antoine observed Plaintiff could "barely stand up and walk on the toes").)  These errors make the ALJ's exclusive reliance on Dr. Axline's testimony even more troubling.

2.      Weight Given to the Findings and Opinions of Examining Sources

The ALJ further committed error in exclusively relying on Dr. Axline's testimony to discredit the opinions and findings of the treating and examining physicians.  "Generally, we give more weight to the opinion of a source who has examined [the claimant] than to the opinion

25

of a source who has not examined [the claimant]."  20 C.F.R. § 404.1527(c)(1).  The ALJ gave the findings and opinion of Dr. Singh, a board-certified neurologist who treated Plaintiff for about a year and a half, "little weight" based on Dr. Axline's testimony.  First, Dr. Axline testified that Dr. Singh's RFC assessment was not supported by the record, because the limitations as to carrying and lifting no weight were such that Plaintiff would not be able drive, open a car door, lift a cup of coffee, or dress himself.  (R. 800.)  Moreover, the ALJ opined that Dr. Singh's limitations would mean Plaintiff was "bedridden."  (R. 595.)  Neither the ALJ nor Dr. Axline took into account that Dr. Singh's limitations were for "a normal competitive five-day a week work environment on a sustained basis."   (*See* R. 264 (Dr. Singh underlined "competitive" when opining on limitations as to carrying/lifting).)  Thus, Dr. Singh's opinions do not conflict with Plaintiff's ability to do certain daily activities.  *See Primiani v. Astrue*, 2010 WL 474642, at *8 (E.D.N.Y. Feb. 5, 2010) (finding ALJ Strauss erred in disregarding a treating physician's RFC assessment because it suggested plaintiff was "bedridden").

The ALJ also relied on Dr. Axline's testimony that Dr. Singh's questionnaires completed the same day were inconsistent and, thus, lacked credibility.  (R. 595.)  Again, Dr. Axline's statement is erroneous.  The Lumbar Spine Impairment Questionnaire focused only on Plaintiff's functional limitations caused by his lumbosacral impairments, while the Physical Residual Functional Questionnaire, addressed all of Plaintiff's functional limitations.  Furthermore, the two questionnaires are consistent with one another.  For example, Dr. Singh's opinions as to standing, sitting, and walking during an eight-hour workday are very similar with each other, and, in both, Dr. Singh opined Plaintiff could not carry any weight.  (*Compare* R. 252-53 *with* R. 264; *see* R. 253, 264.)  The ALJ similarly failed to give significant weight to the opinions of Drs. Carrero and Fleischer, solely based on the testimony of Dr. Axline.  (*See* R. 596.)

The ALJ disregarded the findings of Dr. Antoine, the SSA's consultative examiner, when determining her RFC, because they were "nonspecific."  (R. 601.)  However, the ALJ did not acknowledge that Dr. Antoine was an examining source and that his findings that Plaintiff had difficulty performing daily activities requiring prolonged sitting, standing, walking, heavy lifting, and navigating stairs, were consistent with the opinions of the treating physicians.  (*See* R. 221.)

The ALJ also failed to consider the factors as required in 20 C.F.R. § 404.127(c)(2).  She did not evaluate whether the opinions were supported by evidence in the record or were consistent with the record as a whole.  Failure to give significant weight requires a showing that a treating physician's opinions are contradicted by "substantial evidence in the record."  *Lazore v. Astrue*, 443 F. App'x 650, 652 (2d Cir. 2011).

The treating physicians' findings and opinions deserve controlling weight, because they were consistent with each other and supported by substantial evidence in the record.  Dr. Singh based his diagnoses of lumbar and cervical radiculopathy, which the ALJ disregarded, on several examinations, two MRIs, and EMG and NCV studies.  (R. 242-43, 258-59, 267-68, 275-76, 278.)  Moreover, his diagnoses were consistent with those of the other examining physicians, Drs. Radna, a neurosurgeon, Carrero, an anesthesiologist, Tambakis, an orthopedic surgeon, and Antoine.  (R. 206, 221, 284, 294.)  Dr. Singh's RFC assessment, which the ALJ disregarded, was consistent with Drs. Carrero and Antoine's opinions that Plaintiff could not lift more than five pounds in a competitive work environment and Drs. Carrero and Tambakis' opinions that Plaintiff could not sit continuously.  (R. 220, 286-87, 297.)  Furthermore, the spine surgery Plaintiff underwent in 2006 was the same procedure that Dr. Radna recommended in 1999 and was necessary because of the injuries caused by the workplace accident.  (R. 386-89, 814-16; *see*

*also* R. 809 (record contains no intervening accidents).)  The spine surgery, thus, lends credence to the findings and opinions of Plaintiff's treating physicians.

In sum, the ALJ gave significant weight to two non-examining sources and little weight to every examining source, including the treating physicians, nearly all of whom were specialists in their fields.  In doing so, the ALJ erred in not using the medical evidence in the record to evaluate the strength of the examining physicians, as required by 20 C.F.R. § 404.127(c)(2), and instead based her determination solely on a non-examining physician's testimony.  This is particularly egregious where the treating physicians' findings and opinions were supported by substantial evidence.  Accordingly, the Court finds that the ALJ failed to properly evaluate the medical evidence of Plaintiff's treating physicians.

**B.      Evaluation of Plaintiff's RFC**

The ALJ's duty to develop the record includes ensuring that the record as a whole is complete and detailed enough to allow the ALJ to determine the Plaintiff's RFC.  *Casino-Ortiz v. Astrue*, 2007 WL 27545794, at \*7 (S.D.N.Y. Sep. 21, 2007), *report and recommendation adopted by* 2008 WL 461375 (S.D.N.Y. Feb. 20, 2008).  An RFC determination indicates the most an individual can do despite his or her impairments.  *See* 20 C.F.R. § 404.1545(a).  An individual's RFC takes into consideration her physical and mental limitations, symptoms, including pain, and all other relevant evidence in the case record.  *Id.*  Specifically, with respect to physical abilities, the RFC assessment includes consideration of an individual's exertional capabilities, including her ability to sit, stand, walk, lift, carry, push, and pull.  20 C.F.R. § 404.1545(b).  Non-exertional limitations or restrictions, including manipulative or postural limitations, such as reaching handling, stooping, or crouching, are also considered.  *Id.*

The ALJ's RFC determination is not supported by substantial evidence in the record, particularly the ALJ's determination that Plaintiff was not limited in his ability to sit.  The ALJ found Plaintiff had an RFC to perform light work, based on the opinions of two non-examining sources.  None of the treating physicians' opinions support the ALJ's RFC assessment.  As discussed above, the ALJ improperly disregarded the opinions of the treating physicians and consulting examiner on Plaintiff's exertional limitations in a work setting.  Furthermore, the treating physicians' assessments are consistent with one another and supported by medical evidence.

The ALJ's determination that Plaintiff was not limited in his ability to sit is controverted by the assessments of the treating physicians.  Dr. Singh opined that, in an eight-hour workday, Plaintiff could only sit for about one hour in total and thirty minutes continuously.  (R. 252-53, 263.)  Similarly, both Dr. Carrero and Dr. Tambakis opined that Plaintiff could not sit continuously.  (R. 286, 297.)  The ALJ's determination that Plaintiff could lift and carry ten pounds frequently and twenty pounds occasionally is also controverted by the assessments of the treating physicians.  (*See* R. 255 (Dr. Singh opined Plaintiff could not lift or carry any weight); 286 (Dr. Carrero opined Plaintiff could not lift or carry more than five pounds; 297-99 (Dr. Tambakis opined Plaintiff could lift and carry up to five pounds frequently, five to ten pounds occasionally, and never over ten pounds); *see also* R. 729 (while Dr. Axline stated Plaintiff could lift ten pounds frequently, he also stated that Plaintiff could not do so in a full-time work setting).)

Moreover, Dr. Singh opined that Plaintiff was "totally disabled" on May 9, 2000, based on examinations of Plaintiff and medical testing.  (R. 276.)  This opinion is supported by Dr. Radna who also stated that Plaintiff's disability was total.  (R. 207.)  The opinion is also

supported by the testimony of the vocational expert that a claimant would have a less than sedentary RFC if the ALJ's hypothetical was altered as follows: claimant could not sit more than six hours, walk more than two hours, or carry more than ten pounds in an eight-hour workday. (R. 828-29.) The Court acknowledges that "[a] treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell v. Apfel*, 177 F. 3d 128, 133 (2d Cir. 1999). However, as a treating physician, Dr. Singh "was not offering an opinion on the ultimate issue of legal disability, but rather on the nature and severity of the plaintiff's impairments." *Hall v. Astrue*, 2009 WL 3614529, at *7 (W.D.N.Y. Oct. 26, 2009) (finding a treating physician's opinion on the "issue of the nature and severity of the plaintiff's impairments should be given controlling weight" where "his opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record").

Accordingly, the Court finds that the ALJ's RFC is not supported by substantial and evidence, and there is substantial evidence that Dr. Singh's RFC assessment should be giving significant weight.

## C.     Evaluation of Plaintiff's Credibility

The Second Circuit recognizes that subjective allegations of pain may serve as a basis for establishing disability. *Taylor v. Barnhart*, 83 F. App'x 347, 350 (2d Cir. 2010). However, the ALJ is afforded the discretion to assess the credibility of a claimant and is not "required to credit [plaintiff's] testimony about the severity of her pain and the functional limitations it caused." *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 434 (S.D.N.Y. 2010) (quoting *Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008)). In determining Plaintiff's credibility, the ALJ must adhere to a two-step inquiry set forth by the regulations. *See Peck v. Astrue*, 2010 WL 3125950,

at *4 (E.D.N.Y. Aug. 6, 2010).  First, the ALJ must consider whether there is a medically determinable impairment that could reasonably be expected to produce the pain or symptoms alleged.  20 C.F.R. § 404.1529(b); S.S.R. 96-7p.  Second, if the ALJ finds that the individual suffers from a medically determinable impairment that could reasonably be expected to produce the pain or symptoms alleged, then the ALJ is to evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which they limit the individual's ability to work.  20 C.F.R. § 404.1529(c)(1); S.S.R. 96-7p.

Where the ALJ finds that the claimant's testimony is not consistent with the objective medical evidence, the ALJ is to evaluate the claimant's testimony in light of seven factors: 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of the pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; 5) any treatment, other than medication, that the claimant has received; 6) any other measures that the claimant employs to relieve the pain; and 7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

"If the ALJ rejects plaintiff's testimony after considering the objective medical evidence and any other factors deemed relevant, he must explain that decision with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief." *Correale-Englehart*, 687 F. Supp. 2d at 435.  Where the ALJ neglects to discuss at length his credibility determination with sufficient detail to permit the reviewing court to determine whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence, remand is appropriate.  *Id.* at 435-36; *see also Grosse v. Comm'r of Soc. Sec.*, 2011 WL 128565, at *5 (E.D.N.Y. Jan. 14, 2011) (finding the ALJ committed legal error

31

by failing to apply factors two through seven); *Valet v. Astrue*, 2012 WL 194970, at *22 (E.D.N.Y. Jan. 23, 2012) (remanding because the ALJ failed to address all seven factors).

The ALJ erred in finding that Plaintiff's testimony as to the extent and limiting effects of his symptoms was not credible, because it was inconsistent with the RFC as determined by the ALJ. (R. 592, 601.) The regulations provide that the ALJ must assess the claimant's credibility *before* evaluating the RFC. *Genier v. Astrue*, 606 F. 3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. §§ 404.1529(a)-(b), 404.1512(b)(3), and S.S.R. 96–7p)). To properly assess Plaintiff's credibility, the ALJ should have compared Plaintiff's statements to the objective medical evidence in the record. *Smollins v. Astrue*, 2011 WL 3857123, at *11 (E.D.N.Y. Sep. 1, 2011).

The ALJ also erred in failing to provide any further basis for finding Plaintiff not credible and did not evaluate Plaintiff's testimony in light of the seven factors as required. Plaintiff's complaints of his debilitating and constant pain were supported by objective medical examinations and history of treatments, such as trigger point injections, monthly chiropractic therapy sessions, and prescribed pain medications. (R. 207, 243, 245, 268, 276.) Almost all of the treatment notes in the record document serious back pain, including radiation, shooting pain, and pain spreading to the legs, neck and shoulders. Medical examinations demonstrate that prolonged walking, sitting, and standing precipitated the pain, and medications did little to stem the pain. Plaintiff's complaints of pain are consistent with the treating physicians' RFC assessments and his daily activities. Furthermore, the Appeals Council noted in its order of remand to ALJ Strauss that, "there are many positive objective signs and testing in the record that could explain the claimant's complaints of pain." (R. 632 (third order of remand).)

The Court rejects the Commissioner's argument that the ALJ's credibility finding is supported by substantial evidence because Plaintiff engaged in "extensive daily activities." (Def.

Mem. at 30.)   According to the record, Plaintiff's daily activities during the relevant period included: cleaning twice a week, performing odd jobs around the house once a month, walking a few blocks or driving a short distance to visit friends and family two to three times a week, walking two blocks to attend church once a week, sitting in the yard, and lying on the couch to watch television.   (R. 179, 406-08, 413, 415.)   It belies common sense to call such limited activities "extensive" nor does such conduct show Plaintiff is capable of performing full time sedentary work.   Plaintiff did not "engage[] in any of these activities for sustained periods comparable to those required to hold a sedentary job." *Balsamo v. Chapter*, 142 F. 3d 75, 81 (2d Cir. 1998) (quoting *Carroll v. Sec'y of Health and Human Servs.*, 705 F. 2d 638, 643 (2d Cir. 1983) (where claimant read, watched television, listened to the radio, and rode public transportation, such activities were insufficient to show he was capable of sedentary work)); *see also Martin v. Astrue*, 2009 WL 2356118, at *12 (S.D.N.Y. July 8, 2011) ("mundane tasks of life . . . do not necessarily indicate that [a claimant] is able to perform a full day of sedentary work"); *Murdaugh v. Sec'y of Dept. of Health & Human Servs.*, 837 F. 2d 99, 102 (2d Cir. 1988) (finding claimant who watered the garden and occasionally visited friends disabled).   Nor is Plaintiff's ability to travel to the Dominican Republic indicative that Plaintiff is able to perform a full day of sedentary work or that his symptoms are exaggerated.

Furthermore, the ALJ failed to evaluate Plaintiff's long work history in making a credibility assessment.   "A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability."   *Rivera v. Schweiker*, 717 F. 2d 719, 725 (2d Cir. 1983); *see also Milien v. Astrue*, 2010 WL 5232978, at *10 (E.D.N.Y. Dec. 16, 2010) (finding error where the ALJ failed to consider plaintiff "left her long-standing place of employment only when her symptoms took a dramatic turn for the worse").   Plaintiff was a

33

plumber for approximately twenty five years, fourteen of them as part of a union, and stopped working only because of his workplace injury; thus, Plaintiff was entitled to substantial credibility.  (R. 299, 325, 760-61; *see also* 206 (Plaintiff reported a prior history of lumbosacral pain, but never missed work because of the pain until the accident.).)

Accordingly, the Court finds the ALJ's credibility determination is not supported by substantial evidence.  This record amply supports a finding that there is substantial evidence of Plaintiff's disability over an extended period of time as supported by his treating physicians' findings and opinions and his testimony.

**E.      Remand Solely for a Calculation of Benefits Is Appropriate**

"When the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose,' reversal of the ALJ's decision and remand solely for the calculation of benefits is appropriate.  However, 'when there are gaps in the administrative record or the ALJ has applied an improper legal standard,' a court should remand the case to the Commissioner for the further development of the record."  *Speruggia v. Astrue*, 2008 WL 818004, at *14 (E.D.N.Y. Mar. 26, 2008) (quoting *Parker v. Harris*, 626 F. 2d 225, 235 (2d Cir. 1980)).  Here, the ALJ: (1) lacked good reasons for failing to give controlling weight to Plaintiff's treating physicians' diagnoses and assessments of Plaintiff's ability to work; (2) improperly adopted wholesale the findings and opinion of the non-examining medical consultant; (3) failed to give any basis for rejecting Plaintiff's testimony of his severe and constant pain; and (4) improperly determined Plaintiff's RFC.  This is not a case where there were gaps in the record; rather, here, the ALJ disregarded a well-developed record with little explanation.  There is no basis to conclude that remanding to obtain additional evidence would support the Commissioner's decision.

Furthermore, the case has been ongoing for 15 years, adjudicated and denied by ALJs four times, remanded by the Appeals Council three times, and remanded once by a Judge of this Court on stipulation by the Commissioner.

> "[W]e are mindful of the 'often painfully slow process by which disability determinations are made,' and that 'a remand for further evidentiary proceedings (and the possibility of further appeal) could result in substantial, additional delay.'"

*Butts v. Barnhart*, 388 F. 3d 377, 387 (2d Cir. 2004) (quoting *Carroll*, 705 F. 2d at 644; *Curry v. Apfel*, 209 F. 3d 117, 124 (2d Cir. 2000)); *see also Curry*, 209 F. 3d at 124 ("[W]e believe [remand for the sole purpose of calculating benefits] to be particularly appropriate given that [plaintiff's] application has been pending more than six years"); *Primiani*, 2010 WL 474642, at *8 ("rather than subject [plaintiff] once again to the painfully slow process by which disability determinations are made," the court remanded solely for the calculation of benefits). Accordingly, the case is remanded solely for the calculation of benefits for the disability period of January 19, 1998 through the date last insured, December 31, 2003.

The Court is constrained to make a few final observations. The Court is greatly disturbed by the manner in which the ALJ's prior to ALJ Strauss mishandled this case and utterly disregarded the Appeals Council's directives on remand. The Court especially is disturbed by ALJ Strauss' persistence in disregarding the legal standards and regulations she is bound to follow to insure that the beneficent purposes of Social Security Disability benefits are properly fulfilled. Just a day or two prior to issuing the opinion in this case, this Court remanded yet another case for further administrative proceedings based on similar legal errors committed by ALJ Strauss. *See Faherty v. Astrue*, Docket No. 11-cv-2476 (DLI). Notably, she and several other ALJ's are the subject of a civil suit pending before another judge of this Court for their

35

failure to execute their duties properly.[3]   Therefore, it is this Court's recommendation to the Commissioner of Social Security that, at a minimum, there be some oversight or review of the procedures followed by ALJ's as well as periodic training of ALJ's to insure that they are aware of and abide by the rulings of the federal district and appellate courts, as it seems that they continue to use the same flawed analytical frameworks that result in wrongful denial of benefits, remands, and unnecessarily protracted administrative proceedings.

## **CONCLUSION**

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied and Plaintiff's motion for judgment on the pleadings is granted.   Accordingly, pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Commissioner's decision is reversed and this matter is remanded to the Commissioner solely for the calculation of benefits for the disability period of January 19, 1998 through the date last insured, December 31, 2003.


SO ORDERED.

Dated: Brooklyn, New York
       March 28, 2013


_____
            /s/
       DORA L. IRIZARRY
    United States District Judge

---

[3] *See, Padro, et. al. v. Astrue*, Docket No. 11-cv-1788 (CBA)(RLM)